PROVOSTY, J.
Were we to write an opinion in this case it would tend to the same conclusion, and follow the same line of argument, as the reasons for judgment of the learned trial judge. Therefore we spare ourselves that unnecessary trouble, and simply adopt as our own the said reasons for judgment, which are as follows:
“On August 4, 1915, relator tendered to respondent company 7 cars of stone and switching charges, and demanded that said company spot said cars on its track next to the bank of the river, in order that said cars would be conveniently unloaded on barges which relator had stationed in the river nearby, for the purpose of transporting said stone to a point up the river to be used in revetment work, in which relator is engaged.
“The stone had been shipped by relator from Winnfield to Shreveport, over the Louisiana & Arkansas Railway Company’s line, a competitor of respondent company, which also owns and operates a line of railway from Winnfield to Shreveport.
“The Louisiana & Arkansas Railway Company has no terminal facilities of its own in this city, but uses those of the St. Louis Southwestern Railway Company, whose switching tracks are designated as ‘A,’ ‘B,’ ‘C,’ and ‘D’ on blueprint filed in evidence by respondent, and marked Exhibit 1, and which are several hundred feet from the river bank.
“Relator claims that it was entitled to the switching services which it demanded of respondent company, because it would be more economical to relator in the delivery of its rock to its barges, and for the further reason that respondent company is a common carrier, and as such is under the legal duty to grant the switching privileges demanded. Relator also contends that respondent company has on numerous occasions spotted cars for relator and others on the track in question, and that its refusal to handle the cars in question for relator was an act of illegal and prejudicial discrimination.
“Respondent company declined to accede to the demand of relator, and 'denies that it has used or dedicated the track in question to the general public, and especially denies any discrimination in favor of others or against relator, and avers that any cars which may have been switched or unloaded on said track were so hauled in cases of emergency, or in serving the United States government, or in accommodating industries on said track, or in one or two instances through misapprehension of a subordinate of respondent company.
“Respondent specially avers that the track referred to by relator is a track built by it many years ago as a part of its terminal, and has *789 since then, and is now, continuously used by your respondent as a switch track, in connection with its warehouse, and is a team track for its yards, and it is absolutely necessary and indispensable to the proper conduct of its business and to accommodate industries located on said track.
“The track in red next to the river is the track in dispute in this ease. That portion of this track, from the center of Lake street to the two iron posts near platform, a distance of 300 feet, is used as a ‘team track.’ That portion of this track from these iron posts, indicated by a red arrow on blue print, to first yellow arrow, a distance of 87 feet, is used as an ‘industrial track’ by the Muller Storage & Texas Lumber Company, whose plant is located by the side of this track. That portion of this track from the center of Lake street to the bridge is used as a switching track in connection with the two ‘house’ or warehouse tracks, which diverge from this track and run in front of the L. R. & N. Co.’s freight depot.
“Relator cites as instances of the dedication to general use of this track the fact that respondent company, prior to its refusal to handle the cars in controversy, moved two cars of coal for it over this track, and later refused one car; also the case of a car of coal being put off for the government on this track, and unloaded on a boat in the river; also the case of the Texas Lumber Company having cars spotted there, and of an agreement being made for the spotting of tank cars in there; also the case of several carloads of piling being handled on this track for the Blodgett Construction Company.
“In this latter case the testimony of Mr. Blodgett shows that the handling of several cars of piling on this switch was a matter of special favor, and not demanded as a matter of right. It further shows that it was a case of emergency. The river was rapidly rising, and the false work of the traffic bridge, which was then under construction by this company, was endangered by the high water in the river, and there was urgent need for more piling to protect this false work. Blodgett’s testimony in this matter is fully corroborated by the testimony of Mr. Helm, the general manager and vice president of respondent company.
“As to the spotting of cars on this track by the Texas Lumber Company, the evidence shows that the plant in question is located on this switch, and part of the track was built by said company and part by respondent company. In other words, it is an ‘industry’ track constructed for the special use of the Texas Lumber Company. The only times the Texas Lumber Company has used any part of the track above their platform was when the high water in the river washed out a part of their industry track, and this company was then allowed the use of the 27 feet, part of which is above their platform. The original 90 feet 'of track built for this company was washed into the river, and 60 feet of this was reconstructed, so the present length of this industry track is 87 feet. The portion of the industry track above the platform in front of this company’s plant encroached upon the team track, but this end of the team track is inaccessible to teams and useless for that purpose, and was therefore given to the Texas Lumber Company in lieu of the 30 feet which had caved into the river.
[I] “As to the handling on this track of several carloads of coal for the United States government, Mr. Helm, the general manager of the respondent company, testified that government boats would land in the river near this track, and that the respondent company has sold to the government a good many cars of coal in years gone by, and that this coal was furnished out of respondent company’s own yard, except in one case, when respondent company had an order for a carload of coal for the government and did not have the car, and respondent company took the matter up with the Y. S. & P. Ry. Co., as the government was in a rush to get the coal, and the car was spotted on the track in question under these circumstances. In addition to this, section 22 of the Interstate Commerce Act (Act Feb. 4, 1887, c. 104, 24 Stat. 387 [U. S. Comp. St. § 8595]) expressly provides ‘that nothing in this act shall prevent the carriage, storage or handling of property free, or at reduced rates, for the United States, states or municipal governments.’
“Article 287 of the Constitution of 1913 contains similar provisions as to services to the state, or any parish, city, or town government to be rendered by common carriers. It cannot, therefore, be seriously argued that the services rendered the general government by respondent company in the handling of these carloads of coal from the yards of respondent company, and on one single case of emergency, were acts of illegal discrimination against relator, even if the services performed in these cases has been purely gratuitous. Respondent company unquestionably had the right to sell the coal in its yards to the government, and to use its own terminal facilities for the delivery of its property to the government boats lying in the river opposite the platform of the Texas Lumber Company. As to the agreement between the respondent company and others for the spot *791 ting of tank cars on this track, there is no testimony whatever of relator to sustain this contention.
“Now, as to the several cars of coal placed on said track for relator by respondent company, Mr. Helm, vice president and general manager of the company, testified as follows: ‘Well, 1 found out that they were spotted there since this suit was filed. I had no knowledge of it at the time it was done, and there was no authority for doing it, and it was not done with either the authority or knowledge of our agent. But the next car that came in for shipment to him was refused by him.’ Witness states that with these exceptions the track in controversy was never used for any other purpose except for receiving the respondent company’s own freight, switching it, and loading it and unloading it.
“The tariff of respondent company (I. C. C. A-5778, p. 8, B) reads: ‘This company will not accept, over its connection, carload shipments to be switched for delivery on its recognized public or team track, or to its freight warehouse, or to their sidings or switchings within the yard limits, where a warehouse or receiving depot of the consignee is not located thereon, and consignee has no facilities for unloading freight direct from car to the warehouse, without the use of drays.’ This rule seems to be general among common carriers, and, aside from the oral testimony in this case, clearly shows that respondent company did not hold its team and industrial track in question to the indiscriminate use of the general public, but reserved it for its own use and the service of the industries located thereon.
[2] “In the face of this rule, and of the testimony of the officers and agents of respondent company, it cannot be seriously contended that the few exceptional cases of emergency or mistake recited in the evidence of this case can constitute, in any legitimate sense, a dedication to public use of the track in question.
[3] “Unquestionably the general rule is that a common carrier, if it can reasonably do so, must receive and transport all freight tendered to it, with legal charges; but this is not an absolute rule, and necessarily, like all other rules, must have its exception.
[4] “The evidehce shows that the Louisiana & Arkansas Railway Company is a'" competitory line of respondent company; that both companies operate lines of transportation from Winnfield, La., to Shreveport, La.; that the Louisiana & Arkansas Railway Company has no terminal facilities of its own, but uses the ample terminal facilities of the St. Louis Southwestern Railway Company; that these terminal facilities run parallel to the track of respondent company, and are only a short distance from the river track; that aE the timber and heavy material used in the construction of the Shreveport and Bossier bridge was delivered on the tracks of the ‘Cotton Belt’ or St. Louis Southwestern Railway Company. Relator could have shipped its rock over the respondent company’s line, and could have availed itself of the use of the track in question, had it seen fit to do so. But relator chose a competitory line, declined to use its ample terminal facilities, because it was more economical to it to use those of respondent company, and, when refused, seeks to compel by mandamus the surrender to it of the terminal facUities of respondent company.
“If it were possible for a competitory railway, either directly or indirectly, through a shipper, to force its competitor to surrender, at any or all times that might suit its convenience or economy, its tram track, industrial track, and house tracks, its terminal facilities, as it were, it would be in the power of such competing line to hinder, delay, or prevent its competitor from handling its own freight, and thereby greatly diminish, or possibly destroy, its patronage in its entirety. If the outside public has such a right, then what is the value of the character and the franchise of a railway company?
“The question here involved is not merely the right of a shipper to compel a common carrier to receive freight at regular stations along its main line, and to transport same to point of destination, when the common carrier has facilities for so doing; but we are dealing in this case with a more serious question, to wit, whether a shipper on a competing Ene can compel a competitor to surrender its terminal facilities at any time, although such shipper is supplied with terminal facilities in the same locality. We must answer this question in the negative, as such a right would be not only in contravention of public policy, but would be in direct violation of that provision of the federal Constitution which expressly prohibits the taking of property without due process of law.
“The question presented for discussion in this case has been expressly decided in the case of Railroad Commission of Arkansas v. St. Louis, I. M. & So. Ry. Co., 24 Interst. Com. R., p. 293.
“The commission in part said: ‘In December, 1909, one C. J. Brockman, a florist at Ft. Smith, Ark., shipped a carload of coal from Excelsior, Ark., to Et. Smith, via the Midland Valley Railroad, whose line from Excelsior to Et. Smith passes into the state of Oklahoma. Brockman’s plant is located a fourth of a mile *793 from a spur track known as “Matthew’s Spur,” belonging- to defendant St. Louis, Iron Mountain & Southern Railway Company. This track is the nearest facility to Brockman’s plant fpr unloading carload freight. Brockman’s plant is about three miles from the connection between the Iron Mountain & Midland Yalley lines. Upon notice or arrival of the shipment at Ft. Smith, Brockman requested the Midland Valley to have the car "switched to Matthew’s Spur, and was informed that the Iron Mountain refused to perform the switching service. He then applied directly to the Iron Mountain Company to have the switching done, and tendered the sum of $5 as payment therefor. The defendant refused to accept the amount tendered or to perform the service, on the ground that it was under no obligation to switch to its team track, from another line connection, a carload of freight as to which it had not participated in the line haul. Brockman thereupon unloaded the car from the nearest point on the Midland Yalley, and hauled the coal by wagon to his plant, a distance of about three miles. Considerable time was thus required for the unloading, and the delay resulted in demurrage charges in the sum of $10.’
“Under this state of facts, the commission held that defendant company was not required to switch a car from another line connection at Ft. Smith, Ark., to its own team track for unloading by the consignee. In the case cited the consignee was compelled to haul a carload of coal three miles, and consumed considerable time in unloading car. In this instant case the consignee had the privilege of using the Cotton Belt terminal facilities, within a few hundred feet of its barge in the river, if it had desired to use same. In the case cited the commission makes a broad distinction between terminal facilities and regular stations on the main line as far as the obligation of carrier to transport freight is concerned. The commission in part said:
“ ‘There is a difference between industrial tracks and team tracks. The former are for the handling of carload freight from and to such plants. The cost of construction is usually borne in part by the owners of the plants. Carload freight is switched to and from the plants irrespective of whether the carrier performing the switching service participated in the line haul or not. Shippers have no part in the construction or maintenance of team tracks. They are analogous to freight depots in that they bear the same relation to carload freight that such depots bear to less than carload freight.’
“ ‘Team track delivery is a service rendered by carriers in receiving and delivering carload freight in connection with their own line business, and is over tracks owned by the carriers. It is a service for which no separate tariff charge is provided, and which is analogous to freight depot service for less than carload freight. A freight depot owned and maintained by a carrier is a terminal facility for use in handling business from its own line, and cannot * * * be used for handling business from other lines without its consent.’
“The commission also said:
“ ‘The defendant denies that it holds itself out to the public as a carrier for the purpose of transferring freight from connections of other lines to its own team tracks, and the switching demanded by Brockman was not a service or movement provided for in any published tariff.
“ ‘The record shows that on these occasions during 1909 the defendant switched cars to Matthew’s Spur from connections on other lines, and it is contended by complainant that its refusal to perform the service requested by Brock-man was a discrimination against him, and in favor of others for whom a like service was performed. However, it is testified by officials of the defendant company that on the occasions referred to the switching was done by mistake or in violation of the rules of the company, and should not therefore be regarded as evidence of a purpose on defendant’s part to perform the service for some persons and not for others. It is shown to be a rule of the company, applicable to all points on its lines, that carload freight is not to be switched to its team tracks from connections on other lines. We do not consider the occurrences referred to, in view of the explanation, as proof that such was the authorized practice of the defendant company.’
“ ‘Complainant denies that any question as to the use of defendant’s tracks or terminal facilities by another carrier is involved in this case. It insists that the service demanded is one that defendant is required to perform as a common carrier for any shipper who demands it. In other words, it asserts that the view contended for would not involve the use of the defendant’s tracks by another carrier, but would simply -require the performance of a service upon tender of a reasonable charge for the service. While in this case the demand was made by an individual and not by the Midland Valley Railroad Company, the service is the equivalent of a terminal service for the railroad which had the line haul.’
“In the case of the Louisville & Nashville Ry. Co. v. Central Stock Yards Co., the Supreme Court of the United States said: ‘The duty of *795 a carrier to accept goods tendered at its station does not extend to the acceptance of cars offered to it at an arbitrary point near its terminus by a competing road, for the purpose of reaching and using its terminal station. To require such an acceptance from a railroad is to take its property in a very effective sense, and cannot bo justified.’ 212 U. S. 145, 29 Sup. Ct. 249, 53 L. Ed. 441. See, also, L. & N. R. R. Co. v. West Coast Naval Stores Co., 198 U. S. 483, 25 Sup. Ct. 745, 49 L. Ed. 1135.
“Prom these cases it is clear that relator is not entitled to the relief requested, and its demands are hereby rejected, and this proceeding dismissed at its cost.
“Done, read, and signed in open court on this the 9th day of October, 1915.
“J. B. Land, District Judge.”
Judgment affirmed at appellant’s cost.
O’NIELL, J., concurs in the decree.